## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA
## MOBILE DIVISION

| | | |
|---|---|---|
| **RACHEL REDDING and** | ) | |
| **Husband  JEFF REDDING,** | ) | |
| | ) | |
| **PLAINTIFFS,** | ) | |
| | ) | |
| **VS.** | ) | **CIVIL ACTION NO:** 20-367 |
| | ) | |
| **C.R. BARD, INC. and BARD** | ) | |
| **PERIPHERAL VASCULAR,** | ) | |
| **INC.,** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |

### COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiffs **RACHEL REDDING** and husband **JEFF REDDING**, by and through their undersigned attorney, hereby sue Defendants **C.R. BARD, INC.** and **BARD PERIPHERAL VASCULAR, INC**., a subsidiary corporation and/or division of C.R. BARD, INC., (collectively, the "Defendants"), and allege as follows:

1.      This is an action for damages relating to Defendants' development, testing, assembling, manufacture, packaging, labeling, preparation, distribution, marketing, supplying, and/or selling the defective product sold under the name "inferior vena cava filter" (hereinafter "IVC filter").

### PARTIES

**Plaintiffs**

2.      Plaintiffs, Rachel Redding and husband Jeff Redding ("Plaintiffs") are and always have been at all relevant times citizens of and residents in Mobile, Alabama, which is located in Mobile County, Alabama.

1

3. The Bard Recovery Filter System which gives rise to this cause of action was implanted into Rachel Redding's body at the Mobile Infirmary Medical Center in Mobile, Alabama, which is located in Mobile County, Alabama.

4. Venue is proper in this judicial district as a substantial part of the events or omissions giving rise to the claim occurred within this judicial district and the Defendants regularly conduct business in this District.

**Defendants**

5. Defendant C.R. Bard, Inc. ("Bard") is a corporation duly organized and existing under the laws of the state of Delaware and has its principal place of business in New Jersey. Bard at all times relevant to this action, designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold the Recovery Filter System to be implanted in patients throughout the United States, including Alabama. At all times relevant hereto, Defendant Bard was or has been engaged in business in Alabama and has conducted substantial business activity in Alabama. Defendant has also carried on solicitations or service activities in the State of Alabama.

6. Defendant Bard Peripheral Vascular, Inc. ("BPV") is a wholly owned subsidiary corporation of defendant Bard, with its principal place of business at 1625 West 3rd Street, Tempe, Arizona. BPV at all times relevant to this action, designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold the Recovery Filter System to be implanted in patients throughout the United States, including Alabama. At all times relevant hereto, Defendant BPV was or has been engaged in business in Alabama and has conducted substantial business activity in Alabama. Defendant has also carried on solicitations or service activities in the State of Alabama.

2

## JURISDICTION AND VENUE

7.      Jurisdiction is proper in this Court under 28 U.S.C. § 1332(a)(1) because the plaintiff and the defendants are citizens of different states, and the amount in controversy exceeds $75,000, excluding interest and costs.

8.      Venue is proper in this Court under 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claim occurred within this judicial district and the Defendants regularly conduct business in this District.

## GENERAL FACTUAL ALLEGATIONS

9.      Rachel Redding, Plaintiff, brings this case for serious injuries she suffered as a result of a surgically implanted medical device, known as a Recovery Filter System (hereafter "Recovery"), which caused severe abdominal pain with immediate hospitalization, serious illness and ongoing physical, emotional, and economic damages.

10.     The Recovery Filter System was designed, manufactured, prepared, compounded, assembled, processed, labeled, marketed, distributed, and sold by Defendants from approximately July 2003 to 2005 for prevention of blood clots (thrombi) from traveling from the lower portions of the body to the heart and lungs.

11.     At all times relevant to this action and prior to Rachel Redding being implanted with a Recovery Filter System, Defendants misrepresented the safety of the Recovery Filter System and negligently designed, manufactured, prepared, compounded, assembled, processed, labeled, marketed, distributed and sold the Recovery Filter System as a safe and effective device to be surgically implanted to prevent blood clots from travelling from the lower portions of the body to the heart and lungs.

12.     At all times relevant to this action and prior to Rachel Redding being implanted with a Recovery Filter System, Defendants knew and had reason to know that the Recovery Filter

3

System was not safe for the patients for whom they were prescribed and implanted because once implanted the devices were prone to fracturing, migrating, excessively tilting, perforating the inferior vena cava wall and otherwise malfunctioning.

13.     At all times relevant to this action and prior to Rachel Redding being implanted with a Recovery Filter System, the Defendants knew and had reason to know that patients implanted with a Recovery Filter System had an increased risk of suffering life-threatening injuries, including, but not limited to: death; hemorrhage; cardiac/pericardial tamponade; cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; perforations of tissue, vessels, and organs; and inability to remove the device.

14.     At all times relevant to this action and prior to Rachel Redding being implanted with a Recovery Filter System, the Defendants had reason to know the Recovery Filter System did not perform as safely as the ordinary customer would expect.

15.     Despite having knowledge of the dangers presented by the Recovery Filter System, the Defendants failed to adequately warn Plaintiff, Plaintiff's health care providers and/or the public at large of these dangers.

## INFERIOR VENA CAVA FILTERS GENERALLY

16.     Inferior Vena Cava (IVC) Filters first came on the medical market in the 1960's. Over the years, several different medical device manufacturers have introduced different designs of IVC filters.

17.     An IVC filter is a device that is designed to filter or "catch" blood clots (called "thrombi") that travel from the lower portions of the body to the heart and lungs. IVC filters may be designed to be implanted, either permanently or temporarily, in the human body, more specifically, within the inferior vena cava.

18.     The inferior vena cava is a vein that returns blood to the heart from the lower portions of the body. In certain people, for various reasons, thrombi travel from the vessels in the legs and pelvis, through the vena cava and into the lungs. Oftentimes, these thrombi develop in the deep leg veins. These thrombi are called "deep vein thrombosis" or "DVT". Once thrombi reach the lungs, they are considered "pulmonary emboli" or "PE".

19.     Certain people are at increased risk for the development of DVT or PE. For instance, someone who undergoes knee or hip joint replacement is at a higher risk for developing DVT/PE. Obese patients are also at an increased risk for DVT/PE. So too are people who have vascular diseases or whom have experienced previous strokes. There are a number of other conditions as well that predispose people to develop DVT/PE.

20.     People at risk for DVT/PE can undergo medical treatment to manage that risk. For example, a doctor may prescribe anticoagulant medications like Heparin, Warfarin, or Lovenox to regulate the clotting factor of the blood. In some people who are at a higher risk for DVT/PE, or who cannot manage their conditions with medications, physicians may recommend surgically implanting an IVC filter to prevent pulmonary thromboembolic events.

21.     IVC filters have been on the market for decades. The first IVC filters were permanent filters. These devices were designed to be left in a patient's IVC permanently and have long term follow-up data (of up to 20 years and longer) supporting their use and efficacy. Beginning in 2003, manufacturers began marketing what are known as optional or retrievable filters. These filters are designed so that they can be surgically removed from a patient after the risk of PE has passed. These IVC filter designs, however, were not intended to remain within the human body for indeterminate periods of time. In other words, the initial designs of retrievable IVC filters were intended to remain implanted for a finite period of time. The Recovery Filter, G2, G2 Express (also known as

the G2X), Eclipse and Denali™ Filter manufactured by Bard and BPV are examples of retrievable filters.

## THE RECOVERY FILTER

22.      In 2003, Bard and BPV submitted a notification of intent to the FDA to market the "Recovery® Filter System" (hereafter "Recovery" or "Recovery Filter") for the prevention of recurrent pulmonary embolism by placement in the inferior vena cava. In July 2003, the FDA cleared the Recovery Filter for marketing and use in the prevention of recurrent pulmonary embolism via *permanent* placement in the vena cava in the following situations:

      a.   Pulmonary thromboembolism when anticoagulants are contraindicated;

      b.   Failure of anticoagulant therapy for thromboembolic disease;

      c.   Emergency treatment following massive pulmonary embolism where anticipated benefits of conventional therapy are reduced;

      d.   Chronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated.

23.      In April 2003, Bard and BPV submitted a Section 510(k) premarket notification of intent to market the Recovery® Filter for the additional intended use of *optional retrieval.* The FDA cleared this additional intended use in July 2003.

24.      Bard and BPV began marketing the device in April 2003 but did not begin full market release until January 2004. Bard and BPV were aware that the Recovery Filter was used extensively off-label, including for purely prophylactic reasons for trauma patients or patients with upcoming surgeries such as bariatric procedures.

25.      The Recovery Filter consists of two (2) levels of six (6) radially distributed Nitinol struts that are designed to anchor the filter into the inferior vena cava and to catch any embolizing clots. There are six short struts, which are commonly referred to as the arms, and six long struts, which are commonly referred to as the legs. Each strut is held together by a single connection to a

cap located at the top of the device. According to the Patent filed for this device, the short struts are primarily for "centering" or "positioning" with the vena cava, and the long struts with attached hooks are designed primarily to prevent the device from migrating in response to "normal respiratory movement" or "pulmonary embolism."

26.     As noted above, the Recovery Filter is constructed with "Nitinol", which is an acronym that stands for Nickel Titanium Naval Ordinance Laboratory. "Nitinol" possesses "shape memory." Meaning, Nitinol will change shape according to changes in temperature, and then retake its prior shape after returning to its initial temperature. When placed in saline, the Nitinol struts become soft and can be straightened to allow delivery through a small diameter catheter. The metal struts then reassume their original shape when warmed to body temperature in the vena cava.

27.     The Recovery Filter is inserted by a catheter that is guided by a physician (normally an interventional radiologist) through a blood vessel into the inferior vena cava. The Recovery Filter is designed to be retrieved in a similar fashion. The implanting physician normally reviews an imaging study prior to placement to determine size of the IVC, renal vein location, and to identify any venous anomalies or clots in the vena cava. Following placement, the physician will normally use an imaging study to confirm successful placement.

28.     The Recovery Filter is prone to an unreasonably high risk of failure and patient injury following placement in the human body. Multiple studies have reported Bard's Recovery Filter to have a fracture and migration rate ranging from 21% to 31.7%. When such failures occur, shards of the device or the entire device can travel to the heart, where it can cause cardiac tamponade, perforation of the atrial wall, myocardial infarction and death. These fractured shards may also become too embedded in tissue or migrate to locations, such as the lungs, and become too dangerous to remove. Consequently, patients are exposed to a lifetime of future risk.

29.     The Recovery Filter similarly poses a high risk of tilting and perforating the vena cava walls. When such failures occur, the device can perforate the duodenum, small bowel, or ureter, which may lead to retroperitoneal hematomas. These failures can also lead to small-bowel obstructions, extended periods of severe pain, and/or death. Further, given the risks of injury in attempting to remove devices that have perforated the vena cava, the device may be irremovable. Ultimately, patients that have this filter implanted in them are faced with a lifetime of future risk.

30.     The Recovery Filter failures described above occur at a substantially higher rate than with other IVC filters.

31.     Soon after the Recovery Filter's introduction to the market, Bard and BPV began receiving large numbers of adverse event reports from health care providers.

32.     The adverse event reports (AERs) associated with IVC filter devices demonstrate that Bard's IVC Filters are far more prone to device failure than are other similar devices. A Prevalence of Fracture and Fragment Embolization of the Bard Recovery and Bard G2 Cava Filters and Clinical Implications Including Cardiac Perforation and Tamponade. *Arch. Int. Med.* 2010 Nov.; 170:1827-31 review of the FDA MAUDE database from the years 2004-2008 reveals data to establish that Bard's IVC filters are responsible for the following percentages of all AERs:

    a.   50% of all adverse events;

    b.   64% of all occurrences of migration of the device;

    c.   69% of all occurrences of vena cava wall perforation; and

    d.   70% of all occurrences of filter fracture.

33.     These failures are attributable, in part, to the fact that the Recovery Filter was designed so as to be unable to withstand the normal anatomical and physiological loading cycles exerted *in vivo.*

34.     In addition to design defects, the Recovery Filter suffers from manufacturing defects. These manufacturing defects include, but are not limited to, the existence of "draw markings" and circumferential grinding markings on the exterior of the surface of the device. The presence of these draw markings and/or circumferential grinding markings further compromises the structural integrity of the device while *in vivo*. In particular, the Recovery Filter is prone to fail at or near the location of draw markings/circumferential grinding markings on the struts of the device. Put simply, the Recovery Filter is not of sufficient strength to withstand normal placement within the human body. The presence of the aforementioned exterior manufacturing defects makes the device more susceptible to failure.

35.     Bard and BPV also knew that no clinical testing, such as animal studies or simulated use tests, was conducted to determine whether the Recovery Filter would perform safely once implanted in the human body and subjected to normal *in vivo* stresses.

36.     Soon after the Recovery Filter's introduction to the market in 2003, Bard and BPV began receiving large numbers of adverse event reports ("AERs") from health care providers reporting that the Recovery® Filter was fracturing post-implantation and that fractured pieces and/or the entire device were migrating throughout the human body, including to the heart and lungs. Bard and BPV also received large numbers of AERs reporting that the Recovery Filter was found to have excessively tilted and/or perforated the inferior vena cava post-implantation. These failures were often associated with reports of severe patient injuries such as:

    a.    Death;

    b.    Hemorrhage;

    c.    Cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart);

    d.    Cardiac arrhythmia and other symptoms similar to myocardial infarction;

e.      Severe and persistent pain; and

f.      Perforations of tissue, vessels and organs.

37.      Within the first year of full market release of the Recovery Filter, Bard and BPV received at least 32 AERs reporting that the Recovery Filter had fractured *in vivo* and at least 22 AERs reporting that the entire device had migrated *in vivo.* Of the 22 reported migration failures, at least nine (9) were reported to have been associated with patient death.

38.      From 2003 through September 2005, Bard and BPV received ever growing numbers of AERs reporting the above-described failures and patient injuries. Defendants knew or should have known that the failure rates associated with the Recovery Filter were substantially higher than other similar products on the market, yet Bard and BPV failed to warn consumers of this unreasonably dangerous device.

39.      In late 2004 or early 2005 Bard and BPV, without notifying consumers of the design and manufacturing flaws inherent in the Recovery Filter, began redesigning the Recovery Filter in an attempt to correct those flaws. The redesigned filter is known as the G2 Filter, which stands for second generation Recovery Filter. Bard later manufactured the G2 Express (also known as the G2X), the Eclipse filter, and the Meridian Filter, which are all based on the original Recovery Filter design. Once Bard and BPV obtained FDA approval to market the redesigned product in or around August 2005, Bard and BPV quietly stopped marketing the Recovery Filter. Bard and BPV failed, however, to make any effort to notify consumers of the risk inherent in the use of the Recovery Filter.

**THE G2 AND G2 EXPRESS FILTER SYSTEM**

40.      In 2005, Bard and BPV redesigned its first generation retrievable filter, Recovery Filter, in an attempt to fix its design and manufacturing flaws. The redesigned filter is known as the G2 Filter, which stands for second generation Recovery Filter.

41.     On August 10, 2005, Bard and BPV submitted a Section 510(k) premarket notification of intent to market the G2 Filter for the prevention of recurrent pulmonary embolism via permanent placement in the inferior vena cava. Bard and BPV cited the Recovery Filter as the substantially equivalent predicate device. Bard and BPV stated that the differences between the Recovery Filter and the G2 Filter were primarily dimensional and no material changes or additional components were added. On August 29, 2005, the FDA cleared the G2 Filter for the same intended uses as the Recovery Filter, except that it was not cleared for retrievable use.

42.     Even after the redesigned G2 Filter was cleared for use, Bard and BPV failed to take any steps to recall the Recovery Filter and/or to notify consumers that the failure rates associated with the Recovery Filter were substantially higher than other similar products on the market.

43.     Bard and BPV marketed the G2 Filter as having "enhanced fracture resistance," "improved centering," and "increased migration resistance." Despite these claims, however, Bard and BPV failed to ensure that the changes made to the G2 Filter were sufficient to cure the defective and unreasonably dangerous nature of the device. Thus, the G2 Filter shares the same defects and health risks as its predicate device.

44.     The G2 Filter's design causes it to be of insufficient integrity and strength to withstand normal *in vivo* body stresses within the human body so as to resist fracturing, migrating, tilting, and/or perforating the inferior vena cava.

45.     Also, like its predecessor, in addition to design defects, the G2 Filter suffers from manufacturing defects. These manufacturing defects include, but are not limited to, the existence of "draw markings" and circumferential grinding markings on the exterior of the surface of the device. The presence of these draw markings and/or circumferential grinding markings further compromises the structural integrity of the G2 Filter while *in vivo*. In particular, the G2 Filter is prone to fail at or near the location of draw markings/circumferential grinding markings on the

struts of the device. Put simply, the G2 Filter is not of sufficient strength to withstand normal placement within the human body. The presence of the aforementioned exterior manufacturing defects makes the device more susceptible to fatigue failure.

46.     As with the Recovery Filter, Bard and BPV immediately began receiving large numbers of AERs reporting that the G2 Filter was, *inter alia,* fracturing, migrating, excessively tilting, and perforating the vena cava once implanted. These failures were again often associated with reports of severe patient injuries such as:

   a.     death;

   b.     hemorrhage;

   c.     cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart);

   d.     cardiac arrhythmia and other symptoms similar to myocardial infarction;

   e.     severe and persistent pain;

   f.     and perforations of tissue, vessels and organs.

47.     Defendants represent the fracture rate of the G2 Filter to be 1.2%. Based upon a review of the data available in the public domain (including the FDA MAUDE database statistics and the published medical literature), this representation does not accurately reflect the true incidence of device fracture for the G2 Filter.

48.     A review of the MAUDE database from the years 2004-2008 reveals data to establish that the Bard and BPV's vena cava filters (including the G2 Filter) are responsible for the majority of all reported adverse events related to inferior vena cava filters.

49.     The G2 Express filter was cleared by the FDA on July 30, 2008. The only significant difference between this filter and the G2 was a new snare tip which was designed in an effort to optimize retrieval. Bard launched and began marketing the G2 Express in August 2008. The G2

and the G2 Express are the same filter, from a design standpoint, and share the same defects and complications.

50.     The G2x filter was cleared by the FDA on October 31, 2008. As with the G2 Express, the G2x had minimal design difference between it and the G2 Filter. Bard launched the G2x Filter in January 2009. The G2, G2 Express, and G2x are the same filter, from a design standpoint, and share the same defects and complications.

51.     Upon information and belief, Plaintiff alleges that as early as 2003, Bard and BPV were aware and had knowledge of the fact that the Recovery Filter was defective and unreasonably dangerous and was causing injury and death to patients who had received it. Similarly, Bard and BPV were aware as early as 2005 that the G2 Filter System family was defective and unreasonably dangerous and was causing injury and death to patients who had received it. Furthermore, due to the similarities in design, Bard should have also known that the G2 Express and G2x were just as dangerous and defective.

52.     Data establish that the failure rate of the G2 Filter System, and filters within that family, was/is exceedingly higher than the rate that Bard and BPV have in the past, and currently continue to publish to the medical community and members of the public. Further, Bard and BPV are aware or should have been aware that the G2 Filter, the G2 Express, and the G2x have a substantially higher failure rate than other similar products on the market; yet, they have failed to warn consumers of this fact.

53.     Upon information and belief, from the time the G2 Filter System became available on the market, Defendants Bard and BPV embarked on an aggressive campaign of "off label marketing" concerning the G2 Filter System. This included representations made to physicians, healthcare professionals, and other members of the medical community that the G2 Filter System

was safe and effective for retrievable use prior to the FDA approving the G2 Filter System for retrievable use.

54.     Despite having knowledge as early as 2005 of the unreasonably dangerous and defective nature of the product, Bard and BPV consciously disregarded the known risks and continued to actively market and offer for sale the G2 Filter System and the G2 Express.

## THE ECLIPSE VENA CAVA FILTER

55.     In an effort to resolve the complications associated with the G2 filter and the G2 Express, Bard designed the Eclipse Vena Cava Filter as the next generation in its filter family.

56.     The Eclipse Filter was cleared by the FDA on January 14, 2010. The only design changes from the G2 family of filters to the Eclipse Filter was that hooks were added to the legs of the filter and the struts of the filter were electropolished. The Eclipse Filter continued to share several of the same design defects and complications associated with the Recovery Filter and G2 family of filters due to the fact that the Eclipse design was based on its predecessors.

57.     Bard launched the Eclipse Filter in 2010. Soon thereafter, Bard began receiving similar complaints associated with the Eclipse filter as it had with the predecessor filters. The Eclipse filter is based on Bard's previous filter designs and thus shares the same or similar design and manufacturing defects as Bard's previous filters and suffers from the same complications.

## THE MERIDIAN FILTER SYSTEM

58.     In August of 2011, the Meridian Filter System was cleared by the FDA for introduction to the global market. The Meridian Filter was submitted under the notification provisions of section 510(k) of the United States Food, Drug and Cosmetic Act ("Act") of 1976 (21 U.S.C. 321 *et seq.).* The Defendants represented to the FDA that the Meridian was substantially similar to the Eclipse Filter System (predicate device).

59.     The Meridian Filter system was the next-generation of Defendants' retrievable or optional filters. The Meridian Filter is made of the same nickel-titanium alloy, Nitinol, as the Recovery, G2 and Eclipse Filters. The design of the Meridian is based on the Eclipse Filter System, which is based entirely off the G2 filter, which in turn is based off the original Recovery Filter. Like the Eclipse, the Nitinol wires used in the Meridian Filter are electropolished prior to the forming of the filter.

60.     As seen with the Recovery, G2 and Eclipse Filters, soon after its introduction to the market, reports were made that the Meridian Filters were fracturing, perforating, migrating, and/or tilting in the patients in which they were implanted. The Meridian Filter System was plagued with manufacturing and design defects that caused damage to patients.

61.     Upon information and belief, Plaintiff alleges that as early as 2011, Bard and BPV were aware and had knowledge of the fact that the Meridian Filter was defective and unreasonably dangerous and was causing injury to patients who had received it. Bard and BPV knew or should have known that the similarities in design between the Meridian Filter and its predecessors made the Meridian Filter just as dangerous and prone to defects and complications as its predecessors.

62.     Data establish that the failure rate of the Meridian Filter was/is exceedingly higher than the rate that Bard and BPV have in the past and currently continue to publish to the medical community and members of the public. Further, Bard and BPV are aware or should have been aware that the Meridian Filter had a substantially higher failure rate than other similar products on the market; yet, they have failed to warn consumers of this fact.

63.     Upon information and belief, from the time the Meridian Filter became available on the market, Defendants Bard and BPV embarked on an aggressive campaign of "off label marketing" concerning the Meridian Filter. This included representations made to physicians,

healthcare professionals, and other members of the medical community that the Meridian Filter was safe and effective for classes of patients when data and the Meridian Filter's own clearance did not allow for such representations.

64. Despite having knowledge as early as 2011, and even earlier based on predecessor filters, of the unreasonably dangerous and defective nature of the product, Bard and BPV consciously disregarded the known risks and continued to actively market and offer for sale the Meridian Filter.

65. The conduct of Bard and BPV as alleged in this Complaint constitutes willful, wanton, gross, and outrageous corporate conduct that demonstrates a conscious disregard for the safety of the Plaintiff and the community at large. Bard and BPV had actual knowledge of the dangers presented by the Meridian Filter, yet consciously failed to act reasonably to:

    a.    Inform or warn Plaintiff, her physicians, or the public at large of these dangers;

    b.    Establish and maintain an adequate quality and post-market surveillance system; and

    c.    Recall the Meridian Filter System from the market.

66. Plaintiff further alleges that Bard and BPV acted in willful, wanton, gross and total disregard for the health and safety of the users or consumers of their Meridian Filter. By doing this, Bard and BPV acted to serve their own interests, and while having reason to know and consciously disregarding the substantial risk that their product might kill or significantly harm patients, or significantly injure the rights of others, consciously pursued a course of conduct knowing that such conduct created a substantial risk of significant harm to other persons.

67. The failures of the Meridian Filter are attributable, in part, to the fact that the Meridian Filter was designed so as to be unable to withstand the normal anatomical and physiological loading cycles exerted *in vivo*.

## WHAT HAPPENS WHEN A RECOVERY FILTER SYSTEM FAILS?

68.     The failure (fracture and/or migration) of the Recovery Filter System leads to a number of different, and potentially fatal, complications. These complications include, but are not limited to:

      a.   Death;

      b.   Hemorrhage;

      c.   Cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart);

      d.   Severe and persistent pain; and

      e.   Perforation of tissue, vessels and organs.

69.     A person who experiences fracture and/or migration of the Recovery Filter System, like Plaintiff Rachel Redding, typically experiences an acute onset of pain. This typically results in the person presenting to an emergency room, hospital, and/or physician for evaluation.

## DEFENDANTS' KNOWLEDGE OF THE FAILURE OF THE RECOVERY FILTER SYSTEM AND THE DANGERS ASSOCIATED WITH THE DEVICE

70.     Upon information and belief, Plaintiff alleges that as early as 2005, Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc. were aware and had knowledge of the fact that the Recovery Filter System was defective and unreasonably dangerous and was causing serious and potentially life-threatening injuries to patients who had been implanted with the Recovery Filter System.

71.     From the time the Recovery Filter System became available on the market, Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc., made representations to physicians, healthcare professionals, and other members of the medical community that the Recovery Filter

System was safe and effective for retrievable use, when they knew or should have known it was not.

72.     The conduct of Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc., as alleged in this Complaint, constituted, willful, wanton, gross, and outrageous corporate conduct that demonstrates a conscious disregard for the safety of Plaintiff Rachel Redding. Defendants C.R. Bard, Inc. and Bard Peripheral Vascular Inc. had actual knowledge of dangers to the life and limb of Rachel Redding presented by the Recovery Filter System; yet, Defendants consciously failed to act reasonably to:

    a.     Inform or warn Plaintiff, her physicians, or the public at large of the dangers; and

    b.     Recall the Denali™ Filter System from the market in a timely and safe fashion.

73.     Despite having knowledge as early as 2005 of the unreasonably dangerous and defective nature of the product, Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc. consciously disregarded the known risks and continued to actively market and offer for sale the Recovery Filter System. Plaintiff alleges that Defendants acted in a willful, wanton, and gross manner, and in total disregard for the health and safety of the users or consumers of its Recovery Filter System, including Plaintiff Rachel Redding. Rather, C.R. Bard, Inc. and Bard Peripheral Vascular, Inc. acted to serve their own interests and consciously pursued a course of conduct knowing that such conduct created a substantial risk of significant harm to other persons, including Rachel Redding. Therefore, Defendants should be required to respond to the Plaintiff in the form of a punitive or exemplary damage award.

## THE FEDERAL REQUIREMENTS

74.     Federal regulation states that "recall means a firm's removal or correction of a marketed product that the Food and Drug Administration considers to be in violation of the laws it

administers and against which the agency would initiate legal action, e.g. seizure." See 21 CFR §7.3(g).

75.     Federal regulation states that "recall classification means the numerical designation, i.e., I, II or III, assigned by the Food and Drug Administration to a particular product recall to indicate the relative degree of health hazard presented by the product being recalled." See 21 CFR §7.3(m).

76.     Federal regulation states that "Class II is a situation in which use of, or exposure to, a violative product may cause temporary or medically reversible adverse health consequences or where the probability of serious adverse health consequences is remote." See 21 CFR §7.3(m).

77.     The classification of the product withdrawals and corrections of Defendants' devices (described above) as Class II Recalls by the FDA confirms by definition that the devices were in violation of federal law and that initiation of legal action or seizure would be indicated for these devices.

78.     Pursuant to federal law, a device is deemed to be adulterated if, among other things, it fails to meet established performance standards, or if the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. See 21 U.S.C. §351.

79.     Pursuant to federal law, a device is deemed to be misbranded if, among other things, its labeling is false or misleading in any particular manner, or if it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. See 21 U.S.C. §352.

80.     Pursuant to federal law, manufacturers are required to comply with FDA regulation of medical devices, including FDA requirements for records and reports, in order to prohibit introduction of medical devices that are adulterated or misbranded, and to assure the safety and effectiveness of medical devices. In particular, manufacturers must keep records and make reports

of any medical device that may have caused or contributed to death or serious injury, or if the device has malfunctioned in a manner likely to cause or contribute to death or serious injury. Federal law also mandates that the FDA establish regulations requiring a manufacturer of a medical device to report promptly to FDA any correction or removal of a device undertaken to reduce a risk to health posed by the device, or to remedy a violation of federal law by which a device may present a risk to health. See 21 U.S.C. §360(i).

81.     Pursuant to federal law, the Secretary of Health and Human Services may prescribe regulations requiring that the methods used in, and that facilities and controls used for, the manufacture, pre-production design validation (including a process to assess the performance of a device but not including an evaluation of the safety or effectiveness of a device), packaging, storage, and installation of a device conform to current good manufacturing practices, as prescribed in such regulations, to assure that the device will be safe and effective and otherwise in compliance with federal law. See 21 U.S.0 §360j(f).

82.     Pursuant to FDA regulation, adverse events associated with a medical device must be reported to FDA within 30 days after the manufacturer becomes aware that a device may have caused or contributed to death or serious injury, or that a device has malfunctioned and would be likely to cause or contribute to death or serious injury if the malfunction was to recur. Such reports must contain all information reasonably known to the manufacturer, including any information that can be obtained by analysis, testing, or other evaluation of the device, and any information in the manufacturer's possession. In addition, manufacturers are responsible for conducting an investigation of each adverse event and must evaluate the cause of the adverse event. See 21 CFR §803.50.

83.     Pursuant to federal regulation, manufacturers of medical devices must also describe in every individual adverse event report whether remedial action was taken in regard to the adverse

event, and whether the remedial action was reported to FDA as a removal or correction of the device. See 21 CFR §803.52.

84.     Pursuant to federal regulation, manufacturers must report to FDA within five (5) business days after becoming aware of any reportable MDR event or events, including a trend analysis that necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health. See 21 CFR §803.53.

85.     Pursuant to federal regulation, device manufacturers must report promptly to FDA any device corrections and removals and maintain records of device corrections and removals. FDA regulations require submission of a written report within ten (10) working days of any correction or removal of a device initiated by the manufacturer to reduce a risk to health posed by the device, or to remedy a violation of the Act caused by the device, which may present a risk to health. The written submission must contain, among other things, a description of the event giving rise to the information reported and the corrective or removal actions taken, and any illness or injuries that have occurred with use of the device, including reference to any device report numbers. Manufacturers must also indicate the total number of devices manufactured or distributed which are subject to the correction or removal and provide a copy of all communications regarding the correction or removal. See 21 CFR §806.

86.     Pursuant to federal regulation, manufacturers must comply with specific quality system requirements promulgated by the FDA. These regulations require manufacturers to meet design control requirements, including but not limited to conducting design validation to ensure that devices conform to defined user needs and intended uses. Manufacturers must also meet quality standards in manufacture and production. Manufacturers must establish and maintain procedures for implementing corrective actions and preventive actions and investigate the cause of nonconforming products and take corrective action to prevent recurrence. Manufacturers are also

21

required to review and evaluate all complaints and determine whether an investigation is necessary. Manufacturers are also required to use statistical techniques where necessary to evaluate product performance. See 21 CFR §820.

87.     The regulations requiring conformance to good manufacturing practices are set forth in 21 CFR §820 et seq. As explained in the Federal Register, because the Current Good Manufacturing Practice (CGMP) regulations apply to a variety of medical devices, the regulations do not prescribe the details for how a manufacturer must produce a device. Rather, the quality system regulations provide a framework of basic requirements for each manufacturer to use in establishing a quality system appropriate to the devices designed and manufactured, and the manufacturing processes employed. Manufacturers must adopt current and effective methods and procedures for each device they design and manufacture to comply with and implement the basic requirements set forth in the quality system regulations.

88.     Pursuant to 21 CFR §820.1(c), the failure to comply with any applicable provision in Part 820 renders a device adulterated under section 501(h) of the Federal Food Drug & Cosmetic Act ("the Act") (21 U.S.C. § 351).

89.     Pursuant to 21 CFR §820.5, each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device designed or manufactured. "Quality system" means the organization's structure, responsibilities, procedures, processes, and resources for implementing quality management. *See* 21 CFR §820.3(v).

90.     Pursuant to 21 CFR §820.22, each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system.

91.     Pursuant to 21 CFR §820.30(a), each manufacturer shall establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met.

92.     Pursuant to 21 CFR §820.30(d), each manufacturer shall establish and maintain procedures for defining and documenting design output in terms that allow an adequate evaluation of conformance to design input requirements.

93.     Pursuant to 21 CFR §820.30(e), each manufacturer shall establish and maintain procedures to ensure that formal documented reviews of the design results are planned and conducted at appropriate stages of the device's design development.

94.     Pursuant to 21 CFR §820.30(f), each manufacturer shall establish and maintain procedures for verifying the device design to confirm that the device design output meets the design input requirements.

95.     Pursuant to 21 CFR §820.30(g), each manufacturer shall establish and maintain procedures for validating the device design. Design validation shall be performed under defined operating conditions on initial production units, lots, or batches, or their equivalents. Design validations shall ensure that devices conform to defined user needs and intended uses and shall include testing of production units under actual or simulated use conditions.

96.     Pursuant to 21 CFR §820.30(h), each manufacturer shall establish and maintain procedures to ensure that the device design is correctly translated into production specifications.

97.     Pursuant to 21 CFR §820.30(i), each manufacturer shall establish and maintain procedures for the identification, documentation, validation or where appropriate verification, review, and approval of design changes before their implementation.

98.     Pursuant to 21 CFR §820.70(a), each manufacturer shall develop, conduct, control, and monitor production processes to ensure that a device conforms to its specifications.

Where deviations from device specifications could occur as a result of the manufacturing process, the manufacturer shall establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications. Such process controls shall include:

a.    Documented instructions, standard operating procedures (SOPs), and methods that define and control the manner of production;

b.    Monitoring and control of process parameters and component and device characteristics during production;

c.    Compliance with specified reference standards or codes;

d.    The approval of processes and process equipment; and

e.    Criteria for workmanship which shall be expressed in documented standards or by means of identified and approved representative samples.

99.    Pursuant to 21 CFR §820.70(b), each manufacturer shall establish and maintain procedures for changes to a specification, method, process, or procedure.

100.    Pursuant to 21 CFR §820.70(c), each manufacturer shall establish and maintain procedures to adequately control environmental conditions that could reasonably be expected to have an adverse effect on product quality, including periodic inspection of environmental control system(s) to verify that the system, including necessary equipment, is adequate and functioning properly.

101.    Pursuant to 21 CFR §820.70(e), each manufacturer shall establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonably be expected to have an adverse effect on product quality.

102.    Pursuant to 21 CFR §820.70(g), each manufacturer shall ensure that all equipment used in the manufacturing process meets specified requirements and is appropriately designed, constructed, placed, and installed to facilitate maintenance, adjustment, cleaning and use.

103.   Pursuant to 21 CFR §820.70(h), each manufacturer shall establish and maintain procedures for the use and removal of manufacturing material which could reasonably be expected to have an adverse effect on product quality to ensure that it is removed or limited to an amount that does not adversely affect the device's quality.

104.   Pursuant to 21 CFR §820.70(i), when computers or automated data processing systems are used as part of production or the quality system, the manufacturer shall validate computer software for its intended use according to an established protocol.

105.   Pursuant to 21 CFR §820.72, each manufacturer shall ensure that all inspection, measuring, and test equipment, including mechanical, automated, or electronic inspection and test equipment is suitable for its intended purposes and is capable of producing valid results. Each manufacturer shall establish and maintain procedures to ensure that equipment is routinely calibrated, inspected, checked, and maintained.

106.   Pursuant to 21 CFR §820.75(a), where the results of a process cannot be fully verified by subsequent inspection and testing, the process shall be validated with a high degree of assurance and approved according to established procedures. "Process validation" means establishing by objective evidence that a process consistently produces a result or product meeting its predetermined specifications. See 21 CFR §820.3(z)(1).

107.   Pursuant to 21 CFR §820.75(b), each manufacturer shall establish and maintain procedures for monitoring and control of process parameters for validated processes to ensure that the specified requirements continue to be met. Each manufacturer shall ensure that validated processes are performed by qualified individuals.

108.   Pursuant to 21 CFR §820.90, each manufacturer shall establish and maintain procedures to control product that does not conform to specified requirements.

109. Pursuant to 21 CFR §820.100, each manufacturer shall establish and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:

a. Analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product, or other quality problem,

b. Investigating the cause of nonconformities relating to product, processes and the quality system;

c. Identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

d. Verifying or validating the corrective and preventative action to ensure that such action is effective and does not adversely affect the finished device;

e. Implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems;

f. Ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and

g. Submitting relevant information on identified quality problems, as well as corrective and preventative actions, for management review.

## DEFENDANTS' RECOVERY FILTER SYSTEM IS A 510(k) CLEARED MEDICAL DEVICE

110. Defendants submitted a §510(k) premarket notification and obtained marketing clearance for its Recovery Filter System from the FDA under Section 510(k) of the Act. *See* 21 U.S.C. §360 *et seq.*

111. Under the §510(k) approval process, the FDA determined that Defendants' Recovery Filter System was "substantially equivalent" to devices that have been reclassified in accordance with the provisions of the Act and did not require FDA approval of a pre-market approval application (PMA).

112.    Defendants' Recovery Filter System is adulterated pursuant to 21 U.S.C. §351 because, among other things, it failed to meet established performance standards, and/or the methods, facilities, or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. *See* 21 U.S.C. §351.

113.    Defendants' Recovery Filter System is misbranded because, among other things, it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. *See* 21 U.S.C. §352.

114.    Defendants' Recovery Filter System is adulterated pursuant to 21 U.S.C. §351 because Defendants failed to establish and maintain Current Good Manufacturing Practice for their Recovery Filter System in accordance with 21 CFR §820 *et seq.,* as set forth above.

115.    Defendants failed to establish and maintain Current Good Manufacturing Practice with respect to the quality audits, quality testing and process validation for their Recovery Filter System.

116.    As a result of Defendants' failure to establish and maintain Current Good Manufacturing Practice as set forth above, Defendants' Recovery Filter System was defective and failed, resulting in injuries to the Plaintiff.

## SPECIFIC FACTUAL ALLEGATIONS AS TO PLAINTIFF

117.    On or about March 6, 2005, Plaintiff underwent surgical placement of a Recovery Filter System at Mobile Infirmary in Mobile, Alabama.

118.    This Recovery Filter was designed, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold by Defendants Bard and BPV.

119.    On November 11, 2019, Plaintiff Rachel Redding went to the Springhill Medical Center in Mobile, Alabama with severe abdominal pain. While at the hospital, Mrs. Redding underwent imaging and at this time it was discovered that she was suffering from severe abdominal

pain caused by her IVC Filter which had fractured, migrated and legs were protruding into her IVC. Plaintiff had to receive medical treatment as a result of the failure of the Recovery Filter System. While treating her abdominal pain, it was discovered that the Bard Recovery Filter had become fractured and would require surgery to remove the filter. On or about November 15, 2019, Rachel Redding, while hospitalized at Springhill Medical Center, had surgery to remove the Bard Recovery Filter System from Rachel Redding's body because it had increased her likelihood of developing further migration and fracture. The Recovery filter was removed with the exception of the fractured leg which is presently in her liver. Plaintiff has incurred significant medical expenses and has endured extreme pain and suffering, loss of enjoyment of life, and other losses. While pieces of the defective Recovery Filter System were able to be removed from her body, the total damage caused from the filter is still unknown as Plaintiff still has a fractured leg of the filter protruding into her liver and will have to continue to have follow-up exams.

## FRAUDULENT CONCEALMENT

120.    Any applicable statutes of limitation have been tolled by the knowing and active concealment and denial of material facts known by Defendants when they had a duty to disclose those facts. Defendants, through their affirmative misrepresentations, actively concealed from Plaintiff and Plaintiff's treating physicians the true risks associated with the Recovery Filter System and have kept Plaintiff ignorant of vital information essential to the pursuit of her claims, without any fault or lack of diligence on Plaintiff's part, for the purpose of obtaining delay on Plaintiff's part in filing on her causes of action. Defendants' fraudulent concealment did result in such delay.

121.    Defendants are estopped from relying on the statute of limitations defense because of Defendants' false representations of the safety, efficacy, and quality of the Recovery Filter System, upon which Plaintiff and her treating physicians relied. Due to Plaintiff's reliance on Defendants' false representations, Plaintiff and her treating physicians did not monitor the status of

the implanted device in a manner that would have revealed its defective condition and did not investigate Defendants' conduct in connection with its Recovery Filter System until Plaintiff sought treatment for symptoms that prompted her treating physician to remove the device. Upon discovering the condition of the device, Plaintiff acted with due diligence by promptly investigating Defendants' wrongdoing and filing this suit.

122.   The Defendants are and were under a continuing duty to disclose the true character, quality and nature of the device that was implanted in Plaintiff, but instead they concealed them.

## CORPORATE/VICARIOUS LIABILITY

123.   At all times herein mentioned, each Defendant was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venturer of the other Defendant herein and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other Defendant, knowing that their collective conduct constituted a breach of duty owed to the Plaintiff, and the public at large.

124.   There exists at all times herein mentioned a unity of interest in ownership between Defendants such that any individuality and separateness between them has ceased and Defendants are the alter ego of each other. Adherence to the fiction of the separate existence of these Defendants as entities distinct from the other will permit an abuse of the corporate privilege and would sanction a fraud and/or would promote injustice.

125.   At all times herein mentioned, Defendants were engaged in the business of, or were successors in interest to, entities engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing and/or

advertising for sale, and selling products for use by Plaintiff. As such, each Defendant is individually, as well as jointly and severally, liable to Plaintiff for her damages.

126.   At all times herein mentioned, the officers and/or directors of the Defendants named herein participated in, authorized and/or directed the production and promotion of the aforementioned products when they knew, or with the exercise of reasonable care and diligence should have known, of the hazards and dangerous propensities of said products, and thereby actively participated in the tortious conduct that resulted in the injuries suffered by Plaintiff.

## FIRST CAUSE OF ACTION

## NEGLIGENCE

127.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

128.   At all times relevant to this cause of action, Defendants Bard and BPV were in the business of designing, developing, setting specifications, manufacturing, marketing, selling, and distributing the Recovery Filter.

129.   Defendants designed, manufactured, marketed, inspected, labeled, promoted, distributed and sold the Recovery Filter that was implanted in Plaintiff.

130.   Defendants had a duty to exercise reasonable and prudent care in the development, testing, design, manufacture, inspection, marketing, labeling, promotion, distribution and sale of the Recovery Filter so as to avoid exposing others to foreseeable and unreasonable risks of harm.

131.   Defendants knew or reasonably should have known that the Recovery Filter was dangerous or was likely to be dangerous when used in its intended or reasonably foreseeable manner.

132.   At the time of manufacture and sale of the Recovery Filter (2004 until August 2005), Defendants knew or should have known that the Recovery Filter:

a.  Was designed and manufactured in such a manner so as to present an unreasonable risk of fracture of portions of the device; and/or

b.  Was designed and manufactured so as to present an unreasonable risk of migration of the device and/or portions of the device; and/or

c.  Was designed and manufactured so as to present an unreasonable risk of the device tilting and/or perforating the vena cava wall; and/or

d.  Was designed and manufactured to have unreasonable and insufficient strength or structural integrity to withstand normal placement within the human body.

133.   At the time of manufacture and sale of the Recovery Filter (2004 until August 2005), Defendants knew or should have known that using the Recovery Filter in its intended use or in a reasonably foreseeable manner created a significant risk of a patient suffering severe health side effects, including, but not limited to: hemorrhage; cardiac/pericardial tamponade; cardiac arrhythmia and other symptoms similar to myocardial infarction; perforations of tissue, vessels and organs; and other severe personal injuries and diseases, which are permanent in nature, including, but not limited to, death, physical pain and mental anguish, scarring and disfigurement, diminished enjoyment of life, continued medical care and treatment due to chronic injuries/illness proximately caused by the device; and the continued risk of requiring additional medical and surgical procedures including general anesthesia, with attendant risk of life-threatening complications.

134.   Defendants knew or reasonably should have known that consumers or users of the Recovery Filter would not realize the danger associated with using the device in its intended use and/or in a reasonably foreseeable manner.

135.   Defendants breached their duty to exercise reasonable and prudent care in the development, testing, design, manufacture, inspection, marketing, labeling, promotion,

distribution and sale of the Recovery Filter in, among other ways, the following acts and omissions:

a. Designing and distributing a product in which they knew or should have known that the likelihood and severity of potential harm from the product exceeded the burden of taking safety measures to reduce or avoid harm;

b. Failing to use reasonable care in manufacturing the product and producing a product that differed from their design or specifications or from other typical units from the same production line;

c. Failing to use reasonable care to warn or instruct Plaintiff, Plaintiffs physicians, or the general health care community about the Recovery Filter's substantially dangerous condition or about facts making the product likely to be dangerous;

d. Failing to perform reasonable pre- and post-market testing of the Recovery Filter to determine whether or not the product was safe for its intended use;

e. Failing to provide adequate instructions, guidelines, and safety precautions to those persons to whom it was reasonably foreseeable would prescribe, use, and implant the Recovery Filter;

f. Advertising, marketing and recommending the use of the Recovery Filter, while concealing and failing to disclose or warn of the dangers known by the Defendants to be connected with and inherent in the use of the Recovery Filter;

g. Representing that the Recovery Filter was safe for its intended use when in fact, the Defendants knew and should have known the product was not safe for its intended purpose;

h. Continuing manufacture and sale of the Recovery Filter with the knowledge that said product was dangerous and not reasonably safe, and failing to comply with FDA regulations and policy;

i. Failing to use reasonable and prudent care in the design, research, manufacture, and development of the Recovery Filter so as to avoid the risk of serious harm associated with the use of the Recovery Filter;

j. Advertising, marketing, promoting and selling the Recovery Filter for uses other than as approved and indicated in the product's label;

k. Failing to establish an adequate quality assurance program used in the manufacturing of the Recovery Filter System; and

1. Failing to establish and maintain an adequate post-market surveillance program.

136.   A reasonable manufacturer, distributor, or seller under the same or similar circumstances would not have engaged in the before-mentioned acts and omissions.

137.   As a direct and proximate result of the foregoing negligent acts and omissions by Defendants, Plaintiff has suffered and will continue to suffer serious physical injuries, economic loss, loss of enjoyment of life, disability, and other losses, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

## STRICT PRODUCTS LIABILITY — FAILURE TO WARN

138.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

139.   Defendants designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the Recovery Filter, including the one implanted into Plaintiff, into the stream of commerce and in the course of same, directly advertised and marketed the device to consumers or persons responsible for consumers, and therefore had a duty to warn of risk of harm associated with the use of the device and to provide adequate instructions on the safe and proper use of the device.

140.   At the time Defendants designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the device into the stream of commerce, Defendants knew or should have known the device was defective and presented an unreasonable danger to users of the product when put to its intended and reasonably anticipated use. The Defendants failed to adequately warn of the device's known or reasonably knowable dangerous propensities and failed to provide adequate instructions on the safe and proper use of the device.

141.   The Defendants knew or should have known at the time they manufactured, labeled, distributed and sold the Recovery Filter, which was implanted into Plaintiff, that the Recovery

Filter posed a significant and higher risk than other similar devices of device failure (fracture, migration, tilting, and perforation of the vena cava wall) and resulting serious injuries.

142.     Therefore, Defendants had a duty to warn of the risk of harm associated with the use of the device and to provide adequate instructions on the safe and proper use of the device. Defendants further had a duty to warn of dangers that they became aware of and to provide proper safety instructions even after the device was distributed and implanted into Plaintiff.

143.     The Defendants failed to timely and reasonably warn of material facts regarding the safety and efficacy of the Recovery Filter. No healthcare provider, including Plaintiff's physicians, or patient would have used the device in the manner directed, had those facts been made known to the prescribing healthcare providers and/or ultimate users of the device.

144.     The warnings, labels, and instructions provided by Defendants at all times relevant to this action are and were inaccurate, intentionally misleading, and misinformed, and misrepresented the risks and benefits and lack of safety and efficacy associated with the device.

145.     The Defendants failed to perform, establish or otherwise facilitate adequate testing and/or quality assurance programs; either of which would have shown that the device posed serious and potential life-threatening adverse effects and complications.

146.     The health risks associated with the device as described herein are of such a nature that ordinary consumers would not have readily recognized the potential harm.

147.     The Recovery filter implanted into Plaintiff was unreasonably dangerous and defective at the time Defendants released it into the stream of commerce due to inadequate warnings, labeling and/or instructions accompanying the product.

148.     When Plaintiff was implanted with the device, Defendants failed to provide any warnings, instructions, or labels regarding the severity and extent of health risks posed by the device, as discussed herein.

149.    Neither Plaintiff nor her healthcare providers knew of the substantial danger associated with the intended and foreseeable use of the device as described herein until after Plaintiff's injury.

150.    Plaintiff and Plaintiff's healthcare providers used the device in a normal, customary, intended, and foreseeable manner, namely as a surgically implanted device used to prevent pulmonary embolisms.

151.    The Recovery Filter implanted into Plaintiff was in the same condition as when it was manufactured, inspected, marketed, labeled, promoted, distributed and sold by Defendants.

152.    As a direct and proximate result of Defendants' lack of sufficient warning and/or instructions, Plaintiff has suffered and will continue to suffer serious physical injuries, economic loss, loss of enjoyment of life, disability, and other losses, in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### STRICT PRODUCTS LIABILITY — DESIGN DEFECTS

153.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

154.    At all times relevant to this action, Defendants developed, tested, designed, manufactured, inspected, labeled, promoted, distributed and sold into the stream of commerce the Recovery Filter, including the one implanted into Plaintiff.

155.    The Recovery Filter was expected to, and did, reach its intended consumers without substantial change in the condition in which it was in when it left Defendants' possession. In the alternative, any changes that were made to the Recovery Filter implanted into Plaintiff were reasonably foreseeable to Defendants.

156.   The Recovery Filter implanted into Plaintiff was defective in design at the time it left Defendants' hands because it failed to perform as safely as persons who ordinarily use the product would have expected.

157.   The Recovery Filter implanted into Plaintiff was defective in design at the time it left Defendants' hands, in that its risks of harm exceeded its claimed benefits.

158.   Plaintiff and Plaintiff's healthcare providers used the Recovery Filter in a manner that was reasonably foreseeable to Defendants.

159.   Neither Plaintiff nor Plaintiff's healthcare providers could have, by the exercise of reasonable care, discovered the device's defective condition or perceived its unreasonable dangers prior to Plaintiff's implantation with the device.

160.   As a direct and proximate result of the Recovery Filter's defective design, Plaintiff has suffered and will continue to suffer serious physical injuries, economic loss, loss of enjoyment of life, disability, and other losses, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

## **STRICT PRODUCTS LIABILITY — MANUFACTURING DEFECT**

161   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

162.   Defendants designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the Recovery Filter that was implanted into Plaintiff.

163.   The Recovery Filter implanted into Plaintiff contained a manufacturing defect when it left the Defendants' possession. The device differed from said Defendants' intended result and/or from other ostensibly identical units of the same product line.

164.    Plaintiff and Plaintiff's healthcare providers used the device in a manner that was reasonably foreseeable to Defendants.

166.    As a result of this condition, the product injured Plaintiff and failed to perform as safely as the ordinary consumer would expect when used in a reasonably foreseeable manner. As a direct and proximate result of the Recovery Filter's manufacturing defect, Plaintiff has suffered and will continue to suffer serious physical injuries, economic loss, loss of enjoyment of life, disability, and other losses, in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

## BREACH OF EXPRESS WARRANTY

167.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

168.    The Defendants through their officers, directors, agents, representatives, written literature and packaging, and written and media advertisement, expressly warranted that the Recovery Filter was safe and fit for use by consumers, was of merchantable quality, did not produce dangerous side effects, and was adequately tested and fit for its intended use.

169.    At the time of making such express warranties, the Defendants knew and/or should have known that the Recovery Filter did not conform to the express warranties and representations and that, in fact, the Recovery Filter is not safe and poses serious health risks, of which the Defendants did not accurately warn.

170.    As a foreseeable, direct, and proximate result of the breach of the express warranties, Plaintiff suffered severe personal injuries and economic loss.

171.    Plaintiff, her healthcare providers, and other consumers relied on the express warranties made by Defendants regarding the safety and efficacy of the Recovery Filter and were reasonable in doing so.

172.    Defendants breached their express warranties because the Recovery Filter was and continues to be defective and not reasonably safe for its intended purpose.

173.    Defendants expressly represented and warranted to the medical community and American consumers, including Plaintiff and her healthcare providers that the Recovery Filter was safe and fit for the purposes intended, that it was of merchantable quality, that it did not pose dangerous health risks in excess of those risks associated with use of other similar devices, that the side effects it did produce were accurately reflected in the warnings, and that it was adequately tested and fit for its intended use.

174.    Defendants knew and/or should have known that the representations and express warranties were false, misleading, and untrue in that said Defendants knew the Recovery Filter was not safe and fit for its intended use, and that the Recovery Filter System caused its users serious injuries that were not adequately warned of, identified, or represented by Defendants.

175.    As a foreseeable, direct and proximate result of Defendants breaching their express warranties, as described herein, Plaintiff has suffered injuries as described herein.

## SIXTH CAUSE OF ACTION

## BREACH OF IMPLIED WARRANTY

176.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

177.    At all times relevant to this action, Defendants designed, researched, developed, manufactured, tested, labeled, inspected, advertised, promoted, marketed, sold, and distributed into the stream of commerce the Recovery Filter System for use as a temporary surgically implanted device used to prevent pulmonary embolisms and for uses other than as approved and indicated in the product's instructions, warnings, and labels.

178.   At the time and place of the sale, distribution, and supply of Defendants' Recovery Filter System to Plaintiff by way of her healthcare providers and medical facilities, Defendants expressly represented and warranted, by labeling materials submitted with the product, that the Recovery Filter System was safe and effective for its intended use.

179.   Defendants knew of the intended use of the Recovery Filter System, at the time they marketed, sold, and distributed the product for use by Plaintiff, and impliedly warranted the product to be of merchantable quality, and safe and fit for its intended use.

180.   Defendants impliedly represented and warranted to the healthcare community, Plaintiff, and her healthcare providers, that the Recovery Filter System was safe and of merchantable quality and fit for the ordinary purpose for which the product was intended and marketed to be used.

181.   The representations and implied warranties made by Defendants were false, misleading, and inaccurate because the Recovery Filter System was defective, unsafe, unreasonably dangerous, and not of merchantable quality, when used as it was marketed and intended to be used. Specifically, at the time Recovery Filter System implanted into Plaintiff left Defendants' hands, it was not in a merchantable condition in that:

   a. It was designed in such a manner so as to be prone to a statistically high incidence of failure, including fracture, migration, excessive tilting, and perforation of the inferior vena cava; and

   b. It was designed in such a manner so as to result in a statistically significant incidence of injury to the organs and anatomy.

182.   Plaintiff and her healthcare providers reasonably relied on the superior skill and judgment of Defendants as the designers, researchers and manufacturers of the product, as to whether the Recovery Filter System was of merchantable quality, safe, and fit for its intended use,

and also relied on the implied warranty of merchantability and fitness for the particular use and purpose for which the Recovery Filter System was manufactured and sold.

183.   Defendants placed the Recovery Filter System into the stream of commerce in a defective, unsafe, and unreasonably dangerous condition, and the product was expected to and did reach Plaintiff without substantial change in the condition in which the Recovery Filter System was manufactured and sold.

184.   Defendants breached their implied warranty because their Recovery Filter System was not fit for its intended use and purpose.

185.   As a proximate result of the Defendants breaching their implied warranties, Plaintiff was caused to suffer the injuries and damages described in this complaint.

## SEVENTH CAUSE OF ACTION

## <u>FRAUDULENT MISREPRESENTATION</u>

186.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges on information and belief as follows.

187.   Defendants, having undertaken the manufacturing, marketing, dispensing, distribution and promotion of Recovery Filter System, owed a duty not to deceive Plaintiff, her healthcare providers and the public regarding the character, safety, quality and/or effectiveness of their product.

188.   Since the product's approval and on multiple occasions to the present date, Defendants fraudulently misrepresented and published information in various forms of media (including, but not limited to, ad campaigns, television, interne, etc.) regarding their product's character, safety, quality and effectiveness.

189.    At the time of Defendants' fraudulent misrepresentations, Plaintiff and/or her healthcare providers were unaware of the falsity of the statements and reasonably believed them to be true.

190.    Defendants breached their duties to Plaintiff by providing false, incomplete, and misleading information regarding the Recovery Filter System.

191.    Defendants acted with deliberate intent to deceive and mislead Plaintiff, her medical providers, and the public.

192.    Plaintiff and/or her healthcare providers reasonably relied on Defendants' deceptive, inaccurate and fraudulent misrepresentations.

193.    As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff suffered physical pain and mental anguish, diminished enjoyment of life, and medical, health, incidental and related expenses.

194.    Defendants' conduct was committed with knowing, conscious, wanton, willful and deliberate disregard for the value of human life and the rights and safety of patients/consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

195.    Plaintiff discovered Defendants' fraudulent misrepresentations less than two months after discovering the filter had fractured and migrated. Plaintiff could not, by the exercise of due diligence, have discovered Defendants' fraud at an earlier date.

## EIGHTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

196.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

197.    At all times relevant to this cause, and as detailed *supra,* Defendants negligently provided Plaintiff, the public at large, and the medical community with false or incorrect information, or omitted or failed to disclose material information concerning the Recovery Filter System, including, but not limited to, misrepresentations relating to the following subject areas:

        a.     The safety of the Recovery Filter System;

        b.     The efficacy of the Recovery Filter System;

        c.     The rate of failure of the Recovery Filter System; and

        d.     The approved uses of the Recovery Filter System.

198.    The information distributed by Defendants to the public, the medical community and Plaintiff in the form of reports, press releases, advertising campaigns, labeling materials, print advertisements, and commercial media contained material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the Recovery Filter System. Defendants made the foregoing misrepresentations knowing that they were false or without reasonable basis. These materials included the instructions for use and warning document that was included in the package of the Recovery Filter System that was implanted into Plaintiff.

199.    The Defendants' intent and purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's healthcare providers; to gain the confidence of the public and the medical community, including Plaintiff's healthcare providers; to falsely assure Plaintiff and Plaintiffs healthcare providers of the quality of the Recovery Filter System and its fitness for use; and to induce the public and the medical community, including Plaintiff's healthcare providers, to request, recommend, prescribe, implant, purchase, and continue to use the Recovery Filter System.

200.    The foregoing representations and omissions by Defendants were in fact false. The Recovery Filter System is not safe, fit, and effective for human use in its intended and reasonably foreseeable manner. Use of the Recovery Filter System is hazardous to patients' health, and said device has a serious propensity to cause patients to suffer serious injuries, including without limitation, the injuries Plaintiff suffered. Further, the device has a significantly higher rate of failure and injury than do other comparable devices.

201.    In reliance upon the false and negligent misrepresentations and omissions made by Defendants, Plaintiff and her healthcare providers were induced to, and did use the Recovery Filter System, thereby causing Plaintiff to sustain severe and permanent personal injuries. Defendants knew and had reason to know that Plaintiff, her healthcare providers, and the general medical community did not have the ability to determine the true facts intentionally and/or negligently concealed and misrepresented by Defendants, and would not have prescribed and implanted same, if the true facts regarding the device had not been concealed and misrepresented by Defendants.

202.    Defendants had sole access to material facts concerning the defective nature of the product and its propensity to cause serious and dangerous complications in the form of dangerous injuries and damages to persons who are implanted with the Recovery Filter System.

203.    At the time Defendants failed to disclose and misrepresented the foregoing facts, and at the time Plaintiff used the Recovery Filter System, Plaintiff and her healthcare providers were unaware of Defendants' negligent misrepresentations and omissions.

204.    Plaintiff, her healthcare providers and the general medical community reasonably relied upon the misrepresentations and omissions made by Defendants. Knowledge of the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of the Recovery Filter System.

205.    Plaintiff's and her healthcare providers' reliance on the foregoing misrepresentations and omissions by Defendants was the direct and proximate cause of Plaintiff's harm as described herein.

206.    Plaintiff discovered Defendants' negligent misrepresentations less than two months after discovering the filter had had tilted, migrated and fractured. Plaintiff should not, by the exercise of due diligence, have discovered Defendants' fraud at an earlier date.

## **PUNITIVE DAMAGES ALLEGATIONS**

207.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

208.    Plaintiff's injury was the result of misconduct of Defendants that manifested a flagrant disregard of the safety of persons who might be harmed by the product in question.

209.    Defendants fraudulently withheld information known to be material and relevant to the harm that Plaintiff suffered or misrepresented information of that type.

210.    Defendants engaged in fraudulent and malicious conduct towards Plaintiff, her medical providers and the public, and thereby acted with willful and wanton and/or conscious and reckless disregard for the safety of Plaintiff and the public.

211.    Defendants are liable to Plaintiff for punitive damages for their wanton, reckless and/or willful conduct in the manufacturing, designing, formulating, producing, creating, making, constructing, and/or assembling a product that is defective.

212.    Plaintiff is entitled to an award of punitive and exemplary damages based upon Defendants' intentional, willful, knowing, fraudulent and malicious acts, omissions, and conduct, and their complete and total reckless disregard for the public safety and welfare.

213.    Defendants had knowledge of, and were in possession of evidence demonstrating that, the Recovery Filter was defective and unreasonably dangerous and had a substantially higher failure rate than did other similar devices on the market. Yet, Defendants failed to:

> a.    Inform or warn Plaintiff or her healthcare providers of the dangers; Establish and maintain an adequate quality and post-market surveillance system; and

214.    Defendants acted to serve their own interests, having reasons to know and consciously disregarding the substantial risk that their product might kill or significantly harm patients, or significantly injure the rights of others. Defendants consciously pursued a course of conduct knowing that such conduct created a substantial risk of significant harm to other persons.

215.    As a direct, proximate, and legal result of Defendants' acts and omissions as described herein, and Plaintiff Rachel Redding's implantation with Defendants' defective product, Plaintiff has suffered and will continue to suffer serious physical injuries, economic loss, loss of enjoyment of life, disability, and other losses, in an amount to be determined at trial.

**TENTH CAUSE OF ACTION**

**<u>LOSS OF CONSORTIUM</u>**

216.    Plaintiffs incorporate by reference all prior allegations.

217.    At all times relevant hereto, Plaintiff's spouse Jeff Redding has suffered injuries and losses as a result of Plaintiff's injuries.

218.    For the reasons set forth herein, Jeff Redding has necessarily paid and has become liable to pay for medical aid, treatment, and medications, and will necessarily incur further expenses of a similar nature in the future as a proximate result of Defendants' misconduct.

219.    For the reasons set forth herein, Jeff Redding has suffered and will continue to suffer the loss of their loved ones' support, companionship, services, society, love, and affection due to Bard IVC Filter injury.

220.     Plaintiffs allege their marital relationship has been impaired and depreciated, and the marital association between husband and wife has been altered.

221.     Jeff Redding has suffered great emotional pain and mental anguish.

222.     As a direct and proximate result of Bard's misconduct, Jeff Redding has sustained Injuries and Damages.

## **PRAYER FOR DAMAGES**

**WHEREFORE,** Plaintiffs Rachel Redding and Jeff Redding, pray for relief on the entire complaint, as follows:

a.     Judgment to be entered against both Defendants on all causes of action of this Complaint, including but not limited to:

1.     Physical pain and suffering in the past and which, in reasonable probability, she will continue to suffer in the future;

2.     Physical impairment and incapacity in the past and which, in reasonable probability, she will continue to suffer in the future;

3.     Pain, suffering and mental anguish in the past and which, in reasonable probability, she will sustain in the future;

4.     Reasonable and necessary medical expenses for treatment received in the past and, based upon reasonable medical probability, the reasonable medical expenses she will need in the future; and

5.     Jeff Redding's loss of consortium; and,

6.     Punitive damages.

b.     Plaintiffs be awarded full, fair, and complete recovery for all claims and causes of action relevant to this action;

c.     Plaintiff be awarded all appropriate costs, fees, expenses, and pre-judgment and post-judgment interest as authorized by the law of the State of Alabama on the judgment entered in Plaintiffs behalf; and,

d.     Such other relief the court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands trial by jury on all issues.

Dated: ___July 14, 2020_____                   Respectfully Submitted

_____
Don McKenna ASB-6494-C66D
Hare, Wynn, Newell & Newton, LLP
2025 Third Avenue North, Suite 800
Birmingham, AL 35203
Telephone: (205) 328-5330
Facsimile: (205) 324-2165
don@hwnn.com
Attorney for Plaintiffs


PLAINTIFFS' REQUEST SERVICE BY CERTIFIED MAIL AS FOLLOWS:

C.R. Bard, Inc.
1822 Underwood Blvd.
Delran, NJ 08075

Bard Peripheral Vascular,Inc.
1625 West Third Street
Tempe, AZ 85281